508 S.E.2d 38

**The STATE, Respondent,**

v.

**Christopher Arnex BROWN, Appellant.**

**No. 2894.**

Court of Appeals of South Carolina.

Heard Oct. 7, 1998.

Decided Oct. 26, 1998.

Senior Assistant Appellate Defender Wanda H. Haile, of S.C. Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott and Assistant Attorney General Caroline Callison Tiffin, of Office of the Attorney General, of Columbia; and Solicitor Donald V. Myers, of Lexington, for respondent.

GOOLSBY, Judge:

Christopher Brown was convicted of armed robbery and sentenced to twenty-five years imprisonment. He appeals, asserting the trial court erred in admitting prejudicial identification evidence and refusing to grant a mistrial based on an improper comment in the state's closing argument. We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

On November 14, 1995, three men[1] robbed Nevada Charlie's Video Poker Club in Lexington County. They also took cash and jewelry from several employees and customers. Surprisingly, a married couple who frequented the club, Jessica and Ricky Johnson, were not robbed, despite the fact that they were wearing valuable jewelry. Police later determined that both Johnsons were involved in planning the robbery.

---

1. Two of the three men were armed.

188

The next day police learned that Jessica Johnson had returned to Nevada Charlie's to claim a reward based on information she had about the robbery. The police interviewed her and subsequently prepared arrest warrants naming four suspects, including Jessica's husband Ricky. One of the warrants was for Ricky's brother, Rodriquez Benefield, and police arrested him on November 18. Benefield was released when his alibi checked out, but not before giving police additional information concerning the perpetrators. Based on Benefield's verified information, the police obtained four additional arrest warrants, including one for appellant Christopher Brown.[2]

Brown was arrested on December 6 and taken to the South Congaree Police Department, where he confessed to participating in the robbery as a lookout. The chief of police supervised his confession, which was documented in a statement dictated to a SLED officer assigned to the case. Afterward, the police showed Brown three photo line-ups. Brown picked out himself and two others as the perpetrators of the robbery.

At some point after the robbery, police showed the same photo line-ups to the victims and witnesses to the crime. No one positively identified Brown. One victim, Jennifer Youngblood, did offer a general description of one of the robbers in her statement to police, describing him as "small framed, maybe 140 pounds" and wearing a "great big" gold ring on a finger of his right hand.[3] On the bottom of the photo array bearing Brown's picture, however, Youngblood wrote "none," indicating she could not definitively identify anyone in the array.

At trial, the prosecuting attorney showed Youngblood the same photo line-up bearing Brown's picture, and she testified that although she had marked "none" at the bottom, she had in fact picked out number three during the earlier showing. Photo number three in the array depicted Christopher Brown.

---

2. Jessica Johnson, Ricky Johnson, and two other men were subsequently arrested and charged in connection with the robbery.

3. The police incident report described Christopher Brown as approximately 5' 6" and 120 pounds; the other men arrested in connection with the robbery averaged 6' 0" and ranged from 180 to 220 pounds.

Brown's counsel immediately objected and moved for a mistrial, challenging Youngblood's testimony as an unreliable in-court identification. The trial court held an *in camera* hearing to evaluate Youngblood's proffered testimony. After argument, the court ruled her photo line-up testimony admissible.

At closing, the solicitor argued to the jury that, if they believed Brown's confession to be involuntary, they should throw the case out. In particular, the solicitor said he would "give Mr. Brown his ring and send him home." Counsel for Brown again moved for a mistrial, arguing that the statement would bias the jury by implying that if they acquitted Brown he would be back on the street committing other crimes. The court, however, denied the motion.

## *LAW/ANALYSIS*

### 1. *Admissibility of Identification Testimony*

The admissibility of evidence falls squarely within the sound discretion of the trial court. *State v. Patrick,* 318 S.C. 352, 457 S.E.2d 632 (Ct.App.1995). Accordingly, evidentiary rulings of the trial court will not be set aside absent an abuse of discretion or prejudicial legal error. *Id.*

Here, Brown argues the trial court erred in admitting Youngblood's photo line-up testimony because it was unreliable. We disagree.

The threshold inquiry in determining the admissibility of testimony regarding a pretrial identification is whether or not the testimonial evidence is sufficiently reliable to satisfy due process safeguards against misidentification. *See State v. Washington,* 323 S.C. 106, 473 S.E.2d 479 (Ct.App.1996); *State v. Johnson,* 318 S.C. 372, 458 S.E.2d 49 (Ct.App.1995). Reliability, in turn, depends upon several factors that must be considered in light of the totality of the circumstances. The trial court must therefore evaluate: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the degree of the witness's attention to the events; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time the identification was made; and (5) the time elapsed between the crime and the identification. *Id.* (citing *Neil v. Biggers,* 409

U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)); *Patrick,* 318 S.C. at 357, 457 S.E.2d at 635.

Under the facts of this case, we find the trial court's *in camera* evaluation and subsequent admission of Youngblood's testimony proper.

Youngblood testified *in camera* that she saw the robber subsequently identified as Brown three times during the robbery. When cross-examined about the length of time she observed Brown, Youngblood stated it was difficult to say but "when you're scared like that, a minute takes an hour to go by." She also described herself as "scared to death" during the robbery. Presumably, this fear heightened her senses and awareness. *Johnson,* 318 S.C. at 375, 458 S.E.2d at 51 (stating that "a person in fear of his life presumably has a more acute degree of attention to his surroundings than a mere passerby").

Youngblood further testified that the lighting at Nevada Charlie's was "normal, like household lighting." Her general physical description of the robber without the gun fit Brown, and, at the time of his arrest, Brown was wearing a large gold ring on his right hand that was compatible with the one Youngblood described to police after the robbery.

Moreover, Youngblood viewed the photo line-ups only six days after the robbery, and no evidence presented at trial indicated that the circumstances surrounding the array were tainted. Though she testified that she could not swear to Brown's identification at the time, Youngblood stated that she believed picture number three was one of the robbers. Furthermore, she explained her hesitancy in terms of caution, i.e., that she did not want to "get an innocent man in trouble" if she were mistaken. In any event, a witness identification need not be one hundred percent certain in order to meet due process requirements. *Washington,* 323 S.C. at 111, 473 S.E.2d at 481; *U.S. v. Peoples,* 748 F.2d 934 (4th Cir.1984) (per curiam) *cert. denied,* 471 U.S. 1067, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985) (finding testimony that defendant merely "resembled" one of the bank robbers admissible).

These facts convince us that the trial court did not err in finding Youngblood's testimony reliable. As the court correctly noted, once reliability is established, "it's up to the jury to

determine the strength of [Youngblood's] testimony on the identification issue."

Finally, we note that Brown's inculpatory statement was admitted into evidence at trial, as was the police chief's testimony that Brown identified himself from the photo line-ups at the time he confessed.

### 2. *Solicitor's Statement during Closing Argument*

 Brown next asserts the trial court erred in denying his motion for a mistrial based on an allegedly improper comment by the solicitor. In closing, the solicitor stated that if the jury disbelieved Brown's confession they should throw the case out and he [the solicitor] would just "give Mr. Brown his ring and send him home." Brown contends the statement prejudiced him in that the jury could infer the negative connotation that, if acquitted, he would "be back on the street . . . doing things that are unlawful again." We find this issue to be without merit.

 The propriety of closing argument is vested in the broad discretion of the trial judge. *State v. Bell,* 302 S.C. 18, 393 S.E.2d 364 (1990). Understandably, the propriety of each individual statement depends on the nature of the trial and the issue involved. *Id.* To merit reversal on appeal, an appellant must show he did not receive a fair trial, *State v. Johnson,* 306 S.C. 119, 410 S.E.2d 547 (1991), *cert. denied,* 503 U.S. 993, 112 S.Ct. 1691, 118 L.Ed.2d 404 (1992), and that a particular comment "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Elkins,* 312 S.C. 541, 544, 436 S.E.2d 178, 180 (1993). Finally, any alleged impropriety must be examined on appeal in light of the entire record. *Johnson,* 306 S.C. at 131, 410 S.E.2d at 555.

Here, the solicitor's comment was clearly intended to rebut Brown's assertion in closing argument that his confession was involuntary. When viewed in context, the comment goes directly to this issue:

Now, if you believe that the Chief or Agent Otterbacher or SLED Agent Rick McDermott that any of these individuals used coercion or threats or somehow brow beat Mr. Brown into giving a confession, then throw the case out, ladies and

gentlemen. I'm not going to tell you to convict somebody if you think that's what law enforcement did in this case. If you think they used trickery, got him to write out a statement then typed one up that was all so different, told him to go ahead and initial it, do this, do that. If you think that, by all means, throw this case out. I'll give Mr. Brown his ring and send him home.

Moreover, in light of the entire record, including Brown's confession and Youngblood's eyewitness testimony, we cannot say that Brown was denied a fair trial. We therefore find no prejudicial error, and the decision of the trial court is

**AFFIRMED.**

HUFF and HOWARD, JJ., concur.